# Exhibit 1
## March 1, 2023 Motion to Compel Hearing Transcript

## Page 1

```
         IN THE UNITED STATES DISTRICT COURT
            NORTHERN DISTRICT OF ILLINOIS
                  EASTERN DIVISION

BENJAMIN GEORGE,              )   Docket No. 20 CV 6911
                              )
            Plaintiff,        )
                              )
       -vs-                   )
                              )   Chicago, Illinois
CITY OF CHICAGO, et al.,      )   March 1, 2023
                              )   11:00 o'clock a.m.
            Defendants.       )

         TRANSCRIPT OF PROCEEDINGS - Motion
     BEFORE THE HONORABLE JOHN ROBERT BLAKEY

APPEARANCES:

For the Plaintiff:     FIRST DEFENSE LEGAL AID
                       BY:  MR. DANIEL MASSOGLIA
                       601 South California Avenue
                       Chicago, Illinois  60612

For Defendant City:    CITY OF CHICAGO LAW DEPARTMENT
                       BY:  MS. CAROLINE J. FRONCZAK
                       2 North LaSalle Street
                       Suite 420
                       Chicago, Illinois  60602

For Defendants Palka,  CITY OF CHICAGO LAW DEPARTMENT
Smith, Ferrara and     BY:  MR. GREGORY M. BECK
Thomas:                2 North LaSalle Street
                       Suite 420
                       Chicago, Illinois  60602


         Laura LaCien, CSR, RMR, FCRR, CRR
              Official Court Reporter
             219 South Dearborn Street
                     Room 1212
              Chicago, Illinois  60604
                   (312) 408-5032
```

## Page 2

```
APPEARANCES:  (Cont'd)

For Defendants Ing and  CITY OF CHICAGO LAW DEPARTMENT
Corona:                 BY:  MR. JORDAN F. YURCHICH
                        2 North LaSalle Street
                        Suite 420
                        Chicago, Illinois  60602

For Defendants          ATTORNEY AT LAW
Gardiner and Sikanich:  BY:  MR. THOMAS R. RAINES
                        20 North Wacker Drive
                        Suite 556
                        Chicago, Illinois  60606
```

## Page 3

(The following proceedings were had in open court:)

COURTROOM DEPUTY: 20 CV 6911, George versus City of Chicago, et al.

THE COURT: Good morning, counsel. Appearance on behalf of the plaintiff?

MR. MASSOGLIA: Daniel Massoglia, your Honor. Good morning.

THE COURT: On behalf of defendants?

MS. FRONCZAK: Good after -- or good morning, your Honor. Caroline Fronczak on behalf of the City of Chicago.

MR. BECK: Gregory Beck on behalf of defendants Ferrara, Smith, Thomas, and Palka.

MR. YURCHICH: Good morning, your Honor. Jordan Yurchich on behalf of Officers Ing and Corona.

MR. CARROLL: Good morning, your Honor. Thomas Carroll on behalf of Charles Sikanich and James Gardiner.

THE COURT: All right. We're here on plaintiff's motion to compel. Are the parties prepared to argue?

MR. MASSOGLIA: Yes, your Honor.

MR. CARROLL: Yes.

THE COURT: All right. These motions are usually a moving target. Things are changing over the course of it. Can you give me an update from -- at least from my review of the pleadings, there's several things that are moot including, I believe, interrogatories 4 and 23, and request

## Page 4

for productions 2, 3, and 7. Anything else been mooted by the parties?

MR. MASSOGLIA: Well, they -- your Honor, respectfully, they -- they would have been mooted had defendants' counsel or defendants tendered any of those answers or information. However, as of today, we've received nothing additional since the supplement.

THE COURT: Well, they agreed to supplement them. Counsel, do you have a deadline for when you can get those issues mooted?

MR. CARROLL: I would imagine within 14 days. I'm going to be out of town next week or it would be shorter than that.

THE COURT: All right. Can you do it by the 13th?

MR. CARROLL: If I could have until the 17th, is that possible?

THE COURT: Saint Paddy's Day, you got it.

MR. CARROLL: Yes.

THE COURT: All right. So 3-17. So that moots it, counsel, because they've said they're going to do it and I just ordered it by a deadline so those are moot.

Anything else that's been mooted or is everything else a live bullet?

MR. MASSOGLIA: Everything else is live, your Honor.

5

1  THE COURT: Okay. All right. I'll -- why don't
2  you go ahead and take them in turn and I'll hear from
3  everybody? Go ahead, counsel.
4  MR. MASSOGLIA: Sure. So as a threshold issue, you
11:05AM 5  know, the plaintiff just wants to first express sympathy,
6  condolences not in court today to try to bring counsel's
7  health or his family's health through the mud. That's not --
8  that's not the point of being here.
9  However, for months we've been asking for pretty
11:05AM 10  reasonable relevant information that we haven't received and
11  so I'm happy to go through one by one but I wanted to state
12  that --
13  THE COURT: Yeah. We're going to go through them
14  one by one --
11:05AM 15  MR. MASSOGLIA: Because we'll be seeking --
16  THE COURT: -- why don't we do that?
17  MR. MASSOGLIA: We'll be seeking expenses as noted.
18  So interrogatory number 7 which sought arrest
19  history, you know, one of the, sort of, primary defects in
11:05AM 20  defendants' responses is a conflation of admissibility with
21  discoverability. The argument is primarily that this --
22  THE COURT: Well, let's take that in an iterative
23  process. Counsel, obviously it doesn't have to be admissible
24  to be discoverable, right?
11:05AM 25  MR. CARROLL: I understand that, yeah.

6

1  THE COURT: Okay. All right. There you go. So
2  that's not an issue. Interrogatory 7 has to do with arrest
3  history. If you get that information, what do you intend to
4  do with it?
11:06AM 5  MR. MASSOGLIA: We intend to see if there is
6  evidence that could be admissible such as the hypothetical in
7  the motion was an arrest in the 1990s for shoplifting. That
8  would speak to, you know, character for truthfulness.
9  Charles Sikanich's --
11:06AM 10  THE COURT: All right. Let's say -- let's say --
11  let's use that hypothetical. All right. So you're saying an
12  arrest -- not a conviction, but an arrest in the 90s would
13  precipitate some admissible future or relevant discovery? I
14  mean, things don't have to be admissible but they do have to
11:06AM 15  be relevant and proportional. What the heck would you do
16  with a 1990 shoplifting?
17  MR. MASSOGLIA: Well, so I guess my request was
18  perhaps not phrased properly. We don't know arrests or
19  convictions. And if something was expunged, you know, I
11:06AM 20  think it could be fair game for discussion not simply an
21  arrest from the 90s for shoplifting but --
22  THE COURT: Okay. Well, that's the example you
23  chose. That makes me think your discovery request you don't
24  know what you're doing with it or that it's not proportional
11:07AM 25  to the case.

7

1  MR. MASSOGLIA: So --
2  THE COURT: So why don't -- why don't we talk about
3  what you need that's proportional to the case regarding
4  arrest history? What are you looking for that you can
11:07AM 5  actually use in a meaningful way --
6  MR. MASSOGLIA: So there are things --
7  THE COURT: -- because an arrest from the 1990s is
8  not it and I think --
9  MR. MASSOGLIA: There are things --
11:07AM 10  THE COURT: -- you know that too. Don't interrupt.
11  MR. MASSOGLIA: I'm sorry, your Honor.
12  THE COURT: Yeah, go ahead.
13  MR. MASSOGLIA: There are things that we don't know
14  and there are things that we know. And one of the things
11:07AM 15  that we know is that, for example, defendant Sikanich was
16  arrested for impersonating a police officer. That to me is
17  information that suggests there may be other aspects of these
18  individuals' backgrounds that we are not aware of because,
19  you know, I'm only aware of that -- that impersonating an
11:07AM 20  officer arrest because of like muckraker who posted a website
21  about look at the ward superintendent and all the dirty
22  things he's done, right, so we don't know very much about it.
23  THE COURT: All right. Counsel, what's your
24  thought on interrogatory 7?
11:08AM 25  MR. CARROLL: Well, I think that -- I think that

8

1  it's very overbroad and the problem is that if -- though
2  information doesn't have to be admissible to be discoverable,
3  it seems to me that the direct route of obtaining admissible
4  evidence would be to ask not about arrests but about arrests
11:08AM 5  in which there was a conviction potentially for something
6  that would be admissible.
7  THE COURT: Well, one of the things I have to look
8  at is proportionality so what's the burden to you? If he's
9  aware of these arrests, I mean, it's -- this is not like you
11:08AM 10  have to do something very complicated. You ask your client
11  have you ever been arrested before and you formulate a
12  response. So what's the burden to it?
13  MR. CARROLL: I think that you only -- I think the
14  burden would be minimal but I think that the -- that you
11:08AM 15  don't ask the burden question until you ask whether the
16  information sought is relevant and I just -- I don't see how
17  it is --
18  THE COURT: Well, what if there was a very recent
19  arrest for impersonating an officer, right?
11:09AM 20  MR. CARROLL: I'm not clear why that would be
21  relevant. I don't think it would be relevant.
22  THE COURT: Well, it could -- it could turn into
23  impeachment, right?
24  MR. CARROLL: If he were convicted, I think it
11:09AM 25  would turn into impeachment. I mean --

Page 9

1  THE COURT: No, not necessarily. All right.
2  Anything further on interrogatory 7 because you haven't
3  articulated any burden at all?
4  MR. CARROLL: It's not a significant burden. I'm
5  not claiming that it is.
6  THE COURT: All right. Do you have any issues
7  regarding confidentiality?
8  MR. CARROLL: Yes. I'm concerned about this
9  information getting out into the public.
10  THE COURT: Well, is there a confidentiality order
11  in place?
12  MR. CARROLL: There is, yes.
13  THE COURT: Okay. So what -- what's the
14  confidentiality issue? I mean, people have to comply with
15  the order, right?
16  MR. CARROLL: I'm just -- yeah. I mean, they would
17  have to comply with the order provided that we -- that we
18  produced it under the confidentiality order.
19  THE COURT: Okay. All right. Anything further on
20  number 7?
21  MR. MASSOGLIA: No, your Honor.
22  THE COURT: All right. How long do you need
23  to -- I'm going to grant the motion to compel on number 7. I
24  haven't heard any burden that confidentiality is going to be
25  addressed. If it's not admissible, then you don't have to

Page 10

1  worry about that because that's a decision for another day
2  but we're talking about discovery. We're not talking about
3  admissibility, so.
4  MR. CARROLL: I understand.
5  THE COURT: All right. Is 3-17 still a good
6  deadline for that, counsel?
7  MR. CARROLL: Yes.
8  THE COURT: Okay. All right. Counsel, what's your
9  next one?
10  MR. MASSOGLIA: The next item is interrogatory
11  number 12 which sought written and oral communications about
12  Benjamin George and about this lawsuit, the plaintiff in this
13  lawsuit.
14  You know, the primary issue and the primary
15  relevance of this information is that whatever, for example,
16  defendant Gardiner or defendant Sikanich said to their
17  colleagues on the day in question is going to be relevant.
18  If they are talking during the course of Benjamin George's
19  prosecution, that is going to be relevant. If they're
20  talking after they are sued, that is going to be relevant.
21  All of these -- all of these topics are something that we'd
22  like to address in a deposition. If there's something that
23  we'd like to know, if there's something that we frankly need
24  to know whether -- we would like to know before deciding
25  whether we want to go to the expense of deposing additional

Page 11

1  former employees of defendant Gardiner and the response from
2  defendants was not responsive, I mean, in -- really in any
3  form and I don't think that this is an outrageous request or
4  a difficult request.
5  And again, going back to the burden portion of the
6  question, the degree to which the defendants remember this
7  information will allow them to answer the question. It's not
8  as if they are needed to -- you know, they don't need to like
9  hire a consultant to determine what they remember and what
10  they don't remember, for example.
11  Now on the question of written communications, it
12  does get a little bit more burdensome because if there's not
13  satisfactory production and there hasn't been, then we would
14  ask for a forensic examination of defendant Gardiner's phone
15  as well as defendant Sikanich's phone because we have witness
16  testimony indicating that these men talked all the time over
17  text messages and the fact that there's just nothing between
18  them suggests to me that something was destroyed or that
19  someone is not looking hard enough and I'd like something or
20  someone independent to --
21  THE COURT: Do you have a good faith basis to
22  believe something was destroyed?
23  MR. MASSOGLIA: I believe it's possible. I'm not
24  sure --
25  THE COURT: What is your good faith basis that they

Page 12

1  actually destroyed something?
2  MR. MASSOGLIA: The fact that there were no
3  communications produced between James Gardiner and Charles
4  Sikanich in discovery and it's been represented to me that
5  there were no written communications but a former employee of
6  defendant Gardiner testified at deposition that they were
7  talking on their phones all the time and where they -- so
8  this is the one day in 2019 when they didn't speak on the
9  phone while they were both going to my client's house
10  harassing his roommate and having him arrested, that's
11  just --
12  THE COURT: Well, speaking on a phone may or may
13  not produce a written record. It depends if they're talking
14  on the phone or using text messages, et cetera.
15  Counsel, what's your thoughts on interrogatory 12?
16  MR. CARROLL: I think it's -- I think it's
17  extremely overbroad. I mean, the level of detail required in
18  order to respond and the breadth of the request "identify
19  each person with whom you have had any non-privileged
20  communications regarding the arrest and prosecution of
21  Benjamin George and/or the present lawsuit," if you asked me
22  to recount every conversation I've had about this lawsuit
23  just personally over the last three years since it came into
24  my caseload, I couldn't possibly do that and I don't know how
25  a --

13

1 THE COURT: Well, a discovery request doesn't
2 require people to create memory that doesn't exist but the
3 response would be pretty simple in that instance, right? "I
4 don't remember," I mean, isn't that a response?
5 MR. CARROLL: It certainly is a response but --
6 THE COURT: Or they do remember because a couple of
7 the conversations were pretty meaningful and they have a
8 recollection about it. Why wouldn't that be relevant and
9 proportional and --
10 MR. CARROLL: I'm not saying that -- I'm saying
11 that the objection was based on -- the interrogatory as
12 phrased to me looked overbroad for the reason that I just
13 stated.
14 THE COURT: Well --
15 MR. CARROLL: It's not that my clients have had no
16 conversation --
17 THE COURT: Hang on a second. Hang on a second.
18 Hang on a second. The reason you said it was overbroad was
19 that people wouldn't remember every conversation and then I
20 addressed that in my question so let's talk about it.
21 There's two parts. There's the oral and the written, right?
22 MR. CARROLL: Uh-huh.
23 THE COURT: The oral is they either remember or
24 they don't, right. So if they remember a meaningful
25 conversation, how would that be overbroad?

14

1 MR. CARROLL: It -- I suppose it wouldn't.
2 THE COURT: Okay. And it wouldn't be burdensome
3 because they either remember or they don't.
4 As to the written, that's a totally different
5 thing. So as to -- interrogatory 12 as to oral communication
6 is going to be granted. They're going to have to try to
7 remember; and if they don't remember, then the defendant -- I
8 mean, the plaintiff is stuck with the answer. And if they
9 have magically have a memory later in the process, then
10 they'll -- they'll be able to talk about the deposition
11 question "well, you were asked on such-and-such a date and
12 you didn't remember it," and then all of the sudden your
13 memory gets better after the fact, that's fine. I mean,
14 that's par for the course.
15 Now the written communication, there might be some
16 issues with I requested forensic review and all sorts of -- I
17 don't know the number of how -- there's no time frame
18 limitation, there's no limitation as to device so there are
19 some burden issues as to that. Can you address that on
20 interrogatory 12?
21 MR. CARROLL: Well, I think that would be -- I
22 don't think that there's any reasonable basis to assume that
23 my clients have withheld anything. In the response both to
24 that and this, sort of, correspondence document requests, I
25 indicated that I would follow up with my clients again to

15

1 confirm that they do not have anything that they haven't
2 provided to me.
3 THE COURT: Have you done that? Have you asked
4 them if there's any written communication?
5 MR. CARROLL: Yes; and I would say that they're --
6 I mean, I can commit to have any written communication that
7 they haven't already produced produced by March 17th.
8 However, I've been told that there are none, so.
9 THE COURT: All right. Anything further on 12,
10 counsel?
11 MR. MASSOGLIA: Yeah. I think the written
12 communications may not just be with occurrence witnesses or
13 things like that. I mean, it could be a whole universe of
14 things. But one category of things that I've thought about
15 is, you know, deliberation about this lawsuit in the media.
16 So they've received a number of media requests,
17 they've issued statements in response to deposition testimony
18 in another action against defendant Gardiner and so these are
19 written communications that relate or could relate to the
20 lawsuit so I just want to make sure that this search --
21 THE COURT: Well, if you have other depositions in
22 another lawsuits, that's a different discovery request, isn't
23 it?
24 MR. MASSOGLIA: Well, they've been asked for
25 comment in this lawsuit as well.

16

1 THE COURT: All right. But you're in possession of
2 that, right?
3 MR. MASSOGLIA: No.
4 THE COURT: You're not in possession of the public
5 statements?
6 MR. MASSOGLIA: In -- I think for several years,
7 there weren't any public statements made. I believe the
8 first public statement that was made was in February --
9 either January or February of this year after there was a
10 motion for summary judgment filed that made public some of
11 Tanya King's allegations and statements about defendant
12 Gardiner what she made while deposed. Defendant Gardiner
13 then issued a statement, I believe, to the Tribune. I don't
14 have a copy of that. But the point being is they were being
15 asked for comment repeatedly by a number of different
16 reporters. We know that because the news stories said
17 so-and-so declined to comment, defendant Gardiner declined to
18 comment.
19 And my presumption is that when you receive a
20 request for information from a lawsuit and you're an elected
21 official and you have the staff, you're talking about that
22 with the staff. You're talking about, you know, what does
23 this mean. You're talking about oh, shoot, you know, I wish
24 we hadn't had that guy falsely arrested, this is a giant
25 pain. Like I don't know what it's going to say but it's that

17

1  sort of stuff, your Honor.
2       THE COURT: What I hear from the other side is he's
3  going to ask his client. To the degree there's oral
4  communications that they remember, they're going to have to
5  respond to that. And if they have and are in possession of
6  written communications, they're going to have to do that too.
7  And it's non-privileged communications. So if you're talking
8  to an attorney and it's attorney-client or it's deliberative
9  process -- whether it's legislative or executive -- I mean,
10 there's a privilege issue that could exist but I haven't
11 heard a request that -- or an indication that they're
12 withholding anything on privilege.
13      Obviously if you have a conversation with your
14 client and you determine that there is a particular
15 communication you think it's privileged, you would have to do
16 a privilege log and I'm sure you would do that so --
17      MR. MASSOGLIA: Sure.
18      THE COURT: -- I don't see a live bullet on 12.
19 He's going to ask his client. Now you might be suspicious of
20 it and you're -- that's -- you're entitled to that opinion as
21 well but there's nothing for me to compel if he's complying,
22 so.
23      All right. Let's move on to the next one. So 12
24 is granted as to oral and written. I'm not going to order a
25 forensic examination of any phones. That's not proportional

18

1  to the needs of the case and a proper predicate has not been
2  granted. Same deadline on 3-17.
3       Okay. Counsel, what's your next one?
4       MR. MASSOGLIA: Interrogatory number 24 which read
5  in substance, have you used any social media or like
6  messaging platforms including but not limited to or directed
7  at any of your employees --
8       THE COURT: Slow down. It happens with everybody.
9  It's not just you. Once people read, they always put their
10 foot on the gas and start going really fast because they
11 think it's helpful. It's not. She can only take 300 words a
12 minute, which is really fast, by the way. But I can -- just
13 read it.
14      Actually, I know what all of them say so if you
15 want to just refer to it by number, that's okay too. Go
16 ahead.
17      MR. MASSOGLIA: Sure. My apologies for speeding
18 things up. Number 24 asks how are these defendants using
19 social media to monitor their critics. It's relevant for
20 impeachment, 404(b) material because multiple critics have
21 reported publicly that defendant Gardiner has, for example,
22 come to their home and taken pictures of their home or come
23 to their place of work and almost come to blows.
24      In this case, defendant Gardiner and defendant
25 Sikanich went to my client's home. It's very similar MO-type

19

1  stuff that I think would be relevant. I don't think it's
2  vague.
3       THE COURT: All right. Counsel, what's your
4  thought on 24?
5       MR. CARROLL: My objection is based on relevancy.
6  I don't see why their use of social media or messaging
7  platforms has anything to do with this lawsuit. This lawsuit
8  pertains to the events on a specific day pertaining to the
9  plaintiff's arrest and my client's use of social media in his
10 office or among staffers has nothing to do with that, so.
11      THE COURT: All right. The motion to compel as to
12 24 is denied. It's got to be related to this case, right?
13 If you want to ask questions, open-ended questions in a
14 deposition, you can do that. We're not going to turn
15 discovery into a free-ranging fishing expedition into every
16 potential use of social media. That's not proportional.
17      All right. What's the next one?
18      MR. MASSOGLIA: I believe we're on to the RFPs 2,
19 3, and I believe part of 7 is mooted. Maybe all of 7. I
20 would just want to -- want to check on that. Yeah, I
21 think -- okay. So these three are addressed.
22      RFP 5, it's not records of arrests. It's pretty
23 similar to the akin interrogatory. Our position is the same.
24 I can expand upon my belief -- what I still believe if you'd
25 like but that's it.

20

1       THE COURT: What's your thought on that one? I
2  mean, it's a -- the other side of the coin on the other
3  request, right, or interrogatory?
4       MR. CARROLL: It is. There's -- I suppose there's
5  more of a burden in this instance. I would just note that in
6  Gardiner's case, he indicated that he is not withholding
7  things -- anything pursuant to the request -- to the
8  objection. In Sikanich's case --
9       THE COURT: And here's the other thing, if there is
10 an arrest, they're not going to necessarily be in possession
11 of those or in control of those documents on it. So if you
12 get the information regarding a particular arrest, then, you
13 know, I don't know if the request -- RFP to them is the way
14 to obtain those records.
15      But if they're in possession of it or in control of
16 it, then -- and it's related to something that is otherwise
17 being disclosed by way of interrogatory, you don't have an
18 objection to it, do you?
19      MR. CARROLL: Not in light of the Court's prior
20 ruling.
21      THE COURT: Okay. All right. Okay. All right.
22 That's one is handled, counsel. What's the next one?
23      MR. MASSOGLIA: Numbers 8, 9 and 10, I believe
24 they're broken up in the motion as 8 and 10 together and 9
25 together. I can address them together or separately

### Page 21

1  depending on --
2       THE COURT: Sure. They're related.
3       MR. MASSOGLIA: Okay. So really a central part of
4  this case is abuse of government office and abuse of power
5  doing so under color -- under color of law while employed by
6  the City of Chicago in the scope of your employment as a City
7  of Chicago alderman or ward superintendent, whatever it may
8  be. There are multiple independent investigations into the
9  conduct of these defendants as it pertains to their use of
10 public office. There is a recent arrest and charge by the
11 attorney general. The attorney general put out a statement
12 on it. I don't exactly know what the attorney general's
13 criminal enforcement ability but something related to also
14 abuse of office as it relates to the machine gun case. And
15 so, you know, I think all of this information is pretty
16 squarely within -- one, it's not disproportional because
17 we're asking for things that they already have. Presumably
18 they can't invoke privilege on something that they were
19 provided by the Chicago -- by a Chicago investigative entity,
20 the board of ethics, whatever it may be. And similarly to
21 the FBI, I mean, they can invoke Fifth Amendment privilege I
22 guess at some point as it relates to this but, you know, I
23 don't see any privilege questions. I don't see much of a
24 burden question because it's not asking them to, you know,
25 search the, you know, the corporate email with ten million

### Page 22

1  emails on it. It's just not a particularly burdensome
2  request.
3       And, you know, I think the other proportionality
4  factors also favor plaintiff. You know, the issues at stake
5  as I've just alluded to -- abuse of official authority,
6  government power -- is hugely important. It's consistent
7  with reformatory purposes of 1983, Section 1983, and in this
8  case it's more so because it is an elected official and --
9  one of its employees.
10      THE COURT: Go ahead.
11      MR. MASSOGLIA: I was just going to keep talking
12 about proportionality.
13      THE COURT: Okay. All right. Let's see what the
14 other side says. What's are your thoughts on 8, 10, 9?
15      MR. CARROLL: Again, the objection is relevancy in
16 all three circumstances. It's not clear to me that all of
17 the -- all of the board of ethics matters are -- involved
18 alleged abuses of power to begin with and the fact that -- I
19 mean, the fact is none of these investigations have been
20 concluded. There's been no findings. This to me just looks
21 like a fishing expedition and I think it's completely beside
22 the point.
23      THE COURT: Can you address -- can you address
24 proportionality? How much information are we talking about,
25 how much -- because, for example, if they're being

### Page 23

1  investigated, their extent of the knowledge of the
2  investigation really depends on where the investigation is
3  because, you know, the inspector general or somebody else is
4  doing something. They don't usually show their cards until a
5  certain point in the process anyway so what are we talking
6  about? Is there a lot of documents? Is there -- I mean,
7  what exactly --
8       MR. CARROLL: To be honest --
9       THE COURT: What I can't assess is proportionality.
10 I understand why he wants it. I don't know what's out there.
11      MR. CARROLL: I'm not clear on that either to be
12 honest. I'm familiar with one of the investigations because
13 it sort of runs along the same lines as another civil matter
14 that's pending before the Northern District pertaining to the
15 social media question. That certainly doesn't look like an
16 abuse of power scenario that would be relevant in this case
17 so I can't say for certain how --
18      THE COURT: Well, when you got the discovery
19 request, I'm assuming you talked to your client about what
20 they either did or did not have that was responsive so --
21      MR. CARROLL: I did, but I also -- I don't know
22 what's happened since I had that -- had those discussions
23 which were awhile back so I can't say what any new
24 developments have been in those -- in the board of ethics
25 matters and, you know --

### Page 24

1       THE COURT: All right. To your knowledge -- I'm
2  sorry to interrupt. But to your knowledge, what would the
3  form be, like letters from investigative bodies or
4  what the -- what kind of discovery are we talking about?
5       MR. MASSOGLIA: I'm not sure, your Honor.
6       THE COURT: Yeah. I'm asking both sides.
7       MR. CARROLL: I mean, I know that a letter will
8  initiate -- you know, a letter is sent to advise the subject
9  of an investigation that -- you know.
10      THE COURT: That's like a form letter, though,
11 isn't it? It's got a couple of numbers on it but that's
12 about it.
13      MR. CARROLL: Probably, yeah. And then -- but then
14 I'm not clear, you know. So in the instance of the Facebook
15 matter, there was -- basically all of the social media
16 communications pertaining to that subject matter were then
17 produced as I understand it so I don't -- I honestly don't
18 have a clear understanding of the scope as it pertains to the
19 board of ethics.
20      I know -- frankly, I know -- the FBI investigation,
21 the defendant Sikanich has a trial on that case literally
22 next week on the 9th of March, commencing on the 9th of
23 March. That to me seems particularly sensitive and --
24      THE COURT: Well, what's the case number on that?
25      MR. CARROLL: I don't have it in front of me.

25

1 THE COURT: Okay.
2 MR. CARROLL: I don't know for sure. All I know is
3 the trial date and the approximate time frame.
4 THE COURT: Well, do you know what the charges
11:28AM 5 were?
6 MR. CARROLL: It was for --
7 THE COURT: Is it a civil or a criminal case?
8 MR. CARROLL: It's a criminal case. It's -- it's
9 related to -- I guess it was reported in the news so I'm not
11:28AM 10 saying anything out of turn here but it was related to the
11 attempted sale of an antique machine gun to a federal
12 agent --
13 THE COURT: Okay.
14 MR. CARROLL: -- and there may be a related charge
11:28AM 15 because it was done on city time allegedly.
16 THE COURT: Okay.
17 MR. CARROLL: So --
18 THE COURT: Well, why don't we -- why don't we do
19 this: As to the RFP 8, 10, and 9, see what your client has.
11:28AM 20 If you need to assert the Fifth Amendment, you're allowed to
21 assert the Fifth Amendment.
22 MR. CARROLL: Of course.
23 THE COURT: If you have documents that you don't
24 think are -- that are responsive but you don't think are
11:29AM 25 discoverable, you can submit them for an *in camera*

26

1 inspection, how does that sound? Because I don't even know
2 what it is so I can't -- it's really hard for me to determine
3 its admissibility when we're dealing with hypotheticals and
4 he doesn't even know what he's got, if anything.
11:29AM 5 MR. MASSOGLIA: Thank you, your Honor.
6 THE COURT: How does that sound?
7 MR. CARROLL: That seems reasonable.
8 THE COURT: Okay. All right. Does that cover
9 everything?
11:29AM 10 MR. MASSOGLIA: I believe the last item was 14
11 through 18 RFPs but I'm pretty sure we've covered that with
12 the orders on the other written communications.
13 THE COURT: Yeah. I think -- I think that's
14 covered.
11:29AM 15 MR. MASSOGLIA: And then, of course, the matter of
16 expenses, Rule 37(a)(5)(A).
17 THE COURT: All right. I don't have a -- I'm not
18 going to impose sanctions. I think both sides have been
19 operating in good faith. I don't have a basis for sanctions.
11:29AM 20 I'm not going to award sanctions. Discovery disputes happen
21 and that's -- that's okay. And usually it takes much more of
22 a predicate to warrant expenses on that and I don't see that
23 in this case.
24 What's our next court date, counsel?
11:30AM 25 MR. MASSOGLIA: Your Honor, we -- you asked us to

27

1 update on the status of the case today but I'm not aware that
2 we have another court date so if you'd like to do that now,
3 plaintiffs are prepared to --
4 THE COURT: Well, in light of the additional
11:30AM 5 discovery, how about I ask the parties to meet and confer
6 regarding revised case management dates so we can make sure
7 everything is going to be reasonable. And then obviously it
8 would relate to after the 17th because you want to see what's
9 produced, right? So maybe a status report a week after that,
11:30AM 10 how does that sound? After the 17th does that sound good and
11 then we can set case management dates by order?
12 MR. MASSOGLIA: Would you -- so --
13 THE COURT: So basically he's got a bunch of stuff
14 that's either coming your way or not on the 17th. A week
11:30AM 15 after that, the parties file a joint status report saying
16 this is what's going on, these are our proposed dates. I'll
17 take a look at that and then I can do a revised case
18 management order.
19 MR. MASSOGLIA: Sure. So is discovery -- this is
11:31AM 20 sort of an academic question but from the 21st to the 24th
21 discovery would theoretically be closed because there's
22 currently a fact discovery --
23 THE COURT: This is what I'm talking about, like
24 if -- there's a cutoff and all kinds of case management dates
11:31AM 25 but some of those might need to be adjusted in light of

28

1 production on the 17th, right?
2 MR. MASSOGLIA: Right. My question is can we take
3 depositions on the 21st, 22nd, and 23rd and so on?
4 THE COURT: Well, if you have scheduled
11:31AM 5 depositions, there's no stay so fire away. If you need to
6 reschedule them in light of what you see on the production by
7 the 17th, that's what I'm saying, you guys meet and confer --
8 MR. MASSOGLIA: Okay.
9 THE COURT: -- try to figure all that out. You go,
11:31AM 10 well, I need this extra time because I got to get this
11 deposition, my guy is not available, he's available this
12 date, all that stuff, how about that?
13 MR. MASSOGLIA: That sounds good, your Honor.
14 THE COURT: So do you want longer for the status
11:31AM 15 report deadline than a week after the 17th or --
16 MR. MASSOGLIA: I think that we'll have a -- at
17 least plaintiff will have a good picture of what we're going
18 to want to ask for. I don't want to speak for defendants.
19 THE COURT: Is a week enough after the production?
11:32AM 20 MS. FRONCZAK: I think so, your Honor.
21 THE COURT: Okay.
22 MR. CARROLL: Yeah. I think that's good.
23 THE COURT: All right. Gloria, give me a status
24 report deadline a week after the 17th.
11:32AM 25 COURTROOM DEPUTY: March 24th.

29

1 THE COURT: All right. Anything else I need to
2 address today?
3 MR. MASSOGLIA: Yes, your Honor. One question that
4 was sort of danced about in the motion but nothing final came
5 of it was the issue of defendants Gardiner and Sikanich's
6 deposition availabilities. In November and December and in
7 February, we've been told we would get availabilities. I
8 don't want to just send them subpoenas, track them down, use
9 that expense and, you know, ruin everybody's day.
10 Can you -- is there any way that we can implore
11 that 3-17 date to also be a date to provide deposition
12 abilities within the following month?
13 MR. CARROLL: That's certainly no problem. I just
14 want to say there's never been any objection -- I assumed we
15 needed to sort all of this out which has been a sort of
16 pending matter for a little while now prior to --
17 THE COURT: You want to look at that stuff before
18 you depose him too, right?
19 MR. MASSOGLIA: Oh, yes, your Honor.
20 THE COURT: All right. Well, meet and confer on a
21 deposition date, work it out, how about that?
22 MR. CARROLL: My clients are happy to sit for
23 deposition, so.
24 THE COURT: All right. Thank you, everybody.
25 MR. MASSOGLIA: Thank you, your Honor.

30

1 MR. CARROLL: Thank you.
2 THE COURT: Gloria, that motion is granted in part
3 and denied in part as stated in open court. Okay.
4 (Proceedings concluded at 11:33 a.m.)

C E R T I F I C A T E

I hereby certify that the foregoing is a complete, true and accurate transcript of the proceedings had in the above-entitled matter before the Honorable John Robert Blakey at Chicago, Illinois, on March 1, 2023.

/s/Laura LaCien          March 17, 2023
Official Court Reporter       DATE